## WILLIAM C. HARPER *v.* BIBB & HOPKINS.

1. VENDOR AND VENDEE: WHAT LIENS OR INCUMBRANCES PURCHASER BOUND TO TAKE NOTICE OF.—The purchaser of the legal title is not bound to take notice of a registered lien or incumbrance on the estate, created by any person other than those through whom he is compelled to deraign his title.

2. SAME.—S. purchased the land in controversy from the State, and received a certificate of purchase, entitling him to a patent, when the purchase-money was paid; a judgment was recovered against S., and, after the purchase-money was paid, his equity in the land was sold thereunder. S., after the judgment became a lien on the land, sold it to M., who procured a patent from the State, conveying the land directly to him. Bibb & Hopkins purchased the legal title from M., for a valuable consideration, and without any actual notice of the existence of the judgment lien. *Held*, that, as they could make out their title directly from the State, through the patent to M., the name of S. not appearing in connection therewith, they were not chargeable with notice of the registered lien of the judgment.

3. SAME: EQUITY WILL NOT RELIEVE AGAINST A BONA FIDE PURCHASER.—A court of equity will not grant relief against an innocent purchaser of the legal title, for a valuable consideration, and without notice.

APPEAL from the Superior Court of Chancery. Hon. Charles Scott, chancellor.

This was a bill filed by Harper against the appellees to recover the possession, and a conveyance of the legal title, of two lots in the city of Jackson, and also for an account for the rents and profits.

The complainant claims title as follows:—

In January, 1834, John Shields purchased the lots from the State on a credit, and gave his three notes with security for the purchase-money, and received from the State a certificate of purchase, which entitled him to a patent when the lots were paid for. On the 16th day of April, A. D. 1838, Shields had paid all the purchase-money.

On the 22d of July, 1837, John Raines recovered a judgment in the Circuit Court of Hinds county, in which the lots were situated, against one C. C. Mayson; and on the 22d of September, 1837, Mayson gave a forthcoming bond in the case, with John Shields and another as sureties, and which bond was forfeited, and had the force and effect of a judgment, on the 16th of October, 1837.

On the 20th of May, 1840, an execution having been issued on this judgment on the forthcoming bond, and levied on the lots, they were sold as the property of Shields, and the complainant, Harper, became the purchaser, and received a deed from the sheriff, which was duly recorded three days thereafter.

The defendants', Bibb & Hopkins, title was as follows:—

On the 22d of June, 1838, Shields sold the lots to one Jacob J. N. Morris, and, by agreement of the parties, executed a title obligating himself to cause to be made direct from the State of Mississippi a good title to said lots, by the 1st day of the ensuing November.

On the 17th of December, 1839, a patent was issued from the State to John Morris to the lots in controversy.

On the 25th May, 1838, Martin, Pleasants & Co. recovered a judgment in the Federal Court at Jackson against said Jacob J. N. Morris; and an execution having issued thereon, Morris gave a forthcoming bond, with John Shields as his surety, which was forfeited on the 3d day of November, 1838. An execution was issued on the judgment on the forthcoming bond on the 11th of February, 1839, returnable on the first Monday in May, 1839. This execution was levied on the lots in controversy, and they were sold, by the written consent of Jacob J. N. Morris indorsed on the execution, on the 20th day of May, 1839, after the return day had elapsed. At this sale, John C. Martin became the purchaser, at the sum of $4790. The marshal's return states that the interest of Morris was levied on and sold, but his deed to Martin conveys the interests of Shields and Morris in the lots. Prickett proves that both John

Morris and Jacob J. N. Morris were present at the marshal's sale, and neither made any objection to the sale.

On the 8th of December, 1842, Martin sold to defendants, Bibb & Hopkins, at the price of $1000.

John Morris died childless, leaving his widow, Caroline Morris, his only heir, and she, on the 5th day of April, 1847, conveyed her interest by a quitclaim deed to Bibb & Hopkins, for the sum of $1387.

Bibb & Hopkins, in their answer, allege that they are *bonâ fide* purchasers of the legal title for value, and without notice of complainant's equity, and plead the same in bar of the relief sought.

They also attacked the sale made by the sheriff to Harper in 1844, on the ground that no affidavit had been made of the insolvency of the principal, Mayson, as provided for by the Act of 1837 (Hutch. Dig. 362), and that, therefore, the levy on Shields, the surety's property, was void. They also denied that Shields owned a complete equity in the lots at the time of the sale, and averred that Prickett, who was the surety of Shields on his notes for the purchase-money, had paid the same or a part thereof, and was therefore entitled to be subrogated to the rights of the State in the lien on the lots, retained to secure the purchase-money.

Upon final hearing, the chancellor dismissed the bill, and the complainant appealed.

*George L. Potter*, for appellant.

The lots are in Hinds. Our judgment was rendered the 16th October, 1837: part of the purchase-money was paid before that date, and our lien attached to the equitable interest of Shields. The whole purchase-money was paid by the 16th April, 1838, when Shields acquired a complete equitable title, and was entitled to a patent, and our lien then covered the whole equitable interest.

The title-bond, from Shields to John Morris, was made the 22d June, 1838, after our lien attached; and the judgment, under which defendants sold the property as the estate of Jacob J. N. Morris, bears date in November, 1838.

It thus appears that we have the older and better title, in equity, and all we need is a legal title,—the patents having issued to John Morris on the 17th November, 1839. Defendants acquired

that·legal title from his widow and heir, on the 5th April, 1847. Our sheriff's deed bears date the 21st May, 1844, and was duly recorded. Defendants, with full notice of our claim, of record, purchased the legal title.

Under such circumstances, it is plain we are entitled to a decree of the legal title.

Defendants may attempt to antedate, and insist that Shields had sold to Morris as early as the 15th April, 1838. They produce two certificates of Shields, dated the 4th May, 1839, reciting that he sold the lots to John Morris, on the former date. This sort of proof will not avail them, for several reasons. 1. Prickett proves the 15th April, 1838, was a Sunday, and a contract of sale on that day would be void. 2. Our lien attached in April, 1838, and Shields, the judgment debtor, could not, in May, 1839, do any act to impair it, nor affect our rights. If judgment debtors might thus defeat their creditors, none would be safe. 3. If there was such a sale, in 1838, it was verbal, and void under the Statute of Frauds. There was no writing, no record, no possession taken, no notice to us. It is vain to rely on such proof. This certificate, appended to the certificate of purchase, is no evidence of the matters recited in it.

But Prickett proves the statements of these certificates false. He says he purchased the property from Morris, "in the summer of 1838," and that it was after that time that Shields contracted with Morris for the lots. He appends the deed from Morris to himself, which bears date March 25th, 1838. The contract of purchase by Morris from Shields was, therefore, after our lien attached.

But, they say, defendants have an equal equity and the legal title, and must therefore prevail. Our judgment was a lien of record in the county, and notice to all the world. Wherefore they purchased their alleged equity, with notice of our lien, and cannot interpose this claim.

What is their equity? They purchased under execution against Jacob Morris, who, they say, was beneficially interested in the title-bond given by Shields to John Morris. But Shields was our judgment debtor, and his property was bound by the lien of our judgment; his title-bond was, in effect, a contract to make title subject to our lien. It is plain a judgment debtor cannot thus create equities against the rights of the judgment creditor. Shields

could only contract to convey subject to our lien. The law declared the property, subject to sale to pay the judgment,—declared that judgment a lien of record, and a notice, to all the world, of that creditor's rights; they knew them. Our deed was of record before defendants acquired the legal title, and it was notice of our claim.

Now, they purchased an equity, they say, under execution against Morris, whose equity was subject to our judgment lien, of which they had notice.

If the law gave the elder judgment the prior right, how can the purchaser of an equity under a junior judgment, claim he has equal equity with one who purchases under the senior? But it is needless to discuss the point. They acquired their claim, with notice of our paramount right; and he who acquires an equity, with notice of another's claim, cannot protect himself by the legal title. 1 Story Eq. § 64, c.

But further, the certificates of purchase issued by the State were made evidence of title, in all controversies relative to the lots. Hutch. Dig. Art. 9, p. 104.

Under a similar statute, relative to certificates of purchase of public lands, this court has held, that a *quasi* legal title passed to a purchaser under execution, though no patent had issued; and that he might maintain ejectment. *Lindsey* v. *Henderson*, 5 Cushm. 502.

Upon this construction, a *quasi* legal title was in Shields, bound by our lien, which we acquired by our purchase; and there is an end of debate about equities.

But did defendants acquire an equity by their execution purchase? The execution was returnable to first Monday in May, 1839, at which time it ceased. The sale was not made until 20th May. Defendants rely on the consent of Jacob Morris to a sale on the third Monday of May. True, he did so consent, but not to a sale under that writ. A venditioni exponas should have issued. No such consent could give efficacy to a defunct execution.

Morris could not authorize a sale of the whole, for his vendees of a three-fourth interest were then in possession. Jacob and John Morris, and Prickett and Walker, owned each a fourth interest, by purchase from Jacob, and took possession under the firm name of John Morris & Co., in the early part of 1839. The patent was issued to John Morris, who agreed to hold for Morris & Co.

It thus appears that, at the time defendants purchased under execution, Jacob Morris had only a fourth interest, and defendants only purchased what was his. They had, at best, only an equity to a fourth, against our equity to the whole.

Defendants object that the sale to complainant is void, because, as they assume, no affidavit was filed showing the insolvency of Mayson, the principal. Complainant purchased the lots as the property of Shields, who was surety in a forthcoming bond, and the claim is, both that the case is within the joint action law of 1837, and that the provisions of that act render the sale void for want of the affidavit. We deny both propositions. The title of that act is, "An act to amend the laws respecting suits to be brought against indorsers of promissory notes." The act was approved May 13, 1837, and took effect sixty days thereafter. In the case under which we claim, *John Rains* v. *C. C. Mayson et al.*, the suit was commenced the 12th April, 1837, prior to the passage of the law, and we insist that the subsequent statute, enacted solely with reference to suits "to be brought" thereafter, is wholly inapplicable to this prior suit. The tenor of the Act of 1837 is wholly prospective.

That act, also, relates solely to suits on bills and notes against drawers, acceptors, indorsers, and sureties thereon, and to no other persons. The executions spoken of are those upon the original judgment, and not executions upon bond. The apparent whole scope of the act is to compel a joinder of all parties to bills and notes, and to so order that the judgment thereon shall be paid by the parties first liable. There is nothing to indicate that a further design was in view, or that the policy extends to forthcoming bonds taken in such cases. Nothing indicates an intent to change the previous law as to executions on forfeited bonds.

There is a decision of the High Court direct to the point,—*Moss* v. *Agr. Bank*, 4 S. & M. 726.

I have examined the transcript in that case (style of suit on High Court docket, *Geo. Finucane et al.* v. *Agr. Bank*, No. 304), and I find the case as follows: The bank sued Finucane April 14, 1837, on a note, and obtained judgment July 15, 1837. Moss joined as surety in writ of error bond October 15, 1837, and the judgment being affirmed, joined in a forthcoming bond July 31, 1839. Exe-

cution issued on the forfeited bond, and he superseded levy on his property upon the ground that Finucane, the principal, had sufficient property, and the case went to the High Court on that proceeding, and is reported as above.    There was no affidavit by the creditor, as required by the Act of 1837, but the court treated it as a case properly arising under the Act of 1822.

It has also been expressly decided, that the Act of 1837 does not repeal the Act of 1822.    *Walker* v. *Gilbert*, 13 S. & M. 697.

Also, that the Act of 1837, being in derogation of the common law, is to be construed strictly.    *Gibson* v. *Hughes*, 6 How. Miss. 319.

Also, that the Act of 1837 does not apply to suits on notes not indorsed.    *Thompson* v. *Planters' Bank*, 2 S. & M. 476.

The transcript in the case of *Raines* v. *Mayson*, under which complainant purchased, shows that the suit was upon a note payable to Raines himself; and the case last cited is an express adjudication that our case was not within the Act of 1837.

In *Hamblin* v. *Foster*, 4 S. & M. 151, it was held that the tenth section of the Act of 1837 was penal on the plaintiff, and the sixth section directory to the sheriff.    It is vain, therefore, to insist that the sheriff is prohibited to sell the property of the security without the affidavit, and that so his act is void.    It has been repeatedly decided that, although the statute requires the sheriff to give notice of the time and place of sale, a sale without such *notice to* an innocent purchaser, is good.

The case of *Hamblin* v. *Foster* is important in another view.    It shows that the Act of 1837 was intended only to regulate proceedings on the original judgment against drawers, indorsers, &c.    The court there hold that the purpose of the act was to protect securities and indorsers on notes and bills, and " to compel the satisfaction of judgments obtained jointly against all the parties to bills of exchange and promissory notes, from the property of the principals in the first instance, before resorting to that of securities or indorsers." To give exemplary damages against a creditor, " who shall cause his execution to be levied on the property of his judgment debtor, who is likewise a security or indorser only on the note or bill upon which the judgment was had, when the judgment debtor, who was also principal in that bill or note, had sufficient property to satisfy the execution."    The fact is thus plainly asserted, that the intent of

the Act of 1837 was to protect from levy the property of the securities and indorsers on the bill or note sued on, so long as the principal in that bill or note had sufficient property. How, then, can it be said that forthcoming bonds are within the act?

The fact is, as was considered in *Moss* v. *Agricultural Bank*, this case is within the Act of 1822 (Hutch. 558, Art. 3), and the sureties might have prevented a levy, by showing property of the principal, in the county, as under that act required.

But, if the Act of 1837 applies, the sale was not void. As we have seen, this court has held that the sixth section of the Act of 1837 is only directory to the sheriff, and the tenth penal on the plaintiff. *Hamblin* v. *Foster*, 4 S. & M. 151.

Our statutes regulating execution sales and prescribing notice by advertisement of the time and place of sale, are also held to be merely directory, and for that reason sales are good though no notice be given. *Minor* v. *Natchez*, 4 S. & M. 630.

The court there said, as to the statute requirement of notice, "It can only be regarded as directory." The reasoning and decision in that case apply fully to this.

In *Hyman* v. *Seaman*, Opinion Book G, 586, this court held, that even under the Act of 1837, a sale of the property of the surety, made without preliminary affidavit, is not void. It declared that strangers could not raise the question at all. Now, where an act is null and void, any one, whether privy or stranger, may show it, and take advantage of the nullity.

The truth is, such levy on the surety is valid, if he does not object in due time. It is voidable, and nothing more, under the Act of 1837. If he lies by until after return term, the sale is valid. *Harper* v. *Hill*, Opinion Book G.

But all this controversy, for want of affidavit, is impertinent. Defendants show that the principal, Mayson, in our case, died between the giving and forfeiture of the bond, and they say, truly, there was no judgment, on bond, against him. It is, therefore, idle to speak of him as principal in that judgment, or to complain that execution was not first levied on his property.

Then, they say, the whole proceedings were void, because of the death of Mayson in the interval between the giving and forfeiture of the bond. If the forfeiture of the bond created a judgment

against Mayson, that judgment was valid, because rendered by mere operation of law; and if the law gave it that effect, it is good and effectual, for it was the act of law, which cannot err.

But there was no statutory judgment against him.   He had died before the law could operate on him.   But the law did operate against the surviving obligors, and, by reason of the forfeiture, awarded judgment against them.   The same result followed as though a suit had been brought against the parties, in the life of Mayson, and had thereafter abated by his death.   The survivors in such a case might object, with equal propriety as in this, that no judgment should go against them, because of the death of their principal.

Under our system, where a defendant in judgment dies, execution may run against all, and is voidable only at the instance of the representatives of the decedent.   The survivors cannot object.

It would be strange if, where, as in this case, the plaintiff in execution is compelled to receive the bond, he should be debarred, by the death of one, of the statutory remedy against the survivors.

Why should the survivors object ?   They were liable to be sued alone and compelled to pay the debt, if the plaintiff was put to suit ; and when but the same result is caused by giving a statutory judgment against them, there seems no just cause for objection, and the rights of the creditor are enforced.

Again, they say, equities are not subject to sale under execution ; and judgments are no lien on equities.   The lien attaches to whatever is subject to sale under execution, and such equities are subject to execution.   *Wolf* v. *Dowell,* 13 S. & M. 107, 108, and cases cited; *Thompson* v. *Wheatley,* 5 S. & M. 499 ; *Moody* v. *Farr,* 6 S. & M. 100.

So they say our judgment was no lien on this after-acquired property ; but this court holds that it was. *Moody* v. *Harper,* Opinion Book F. 530, 532.

Such judgments attach at the moment of acquisition ; and ours attached when the purchase-money was paid.

*Yerger* and *Rucks,* for appellees.

1. No affidavit was made ; and Mayson, the principal in the judgment, had no property in the State out of which the judgment

could have been made. This was necessary, before any levy could be made on the property of Shields, who was a mere surety in the forthcoming bond under which Harper claims. Hutch. Code, 853, secs. 6, 7; *Coleman* v. *Rives et al.*, 2 Cushm. 634.

But it is said the surety made no affidavit, as required by the Act of 1822, of the fact of his suretyship, and that this was necessary. The case of *Walker* v. *Gilbert*, 13 S. & M. 697, is cited to sustain this position, and also the position that the Act of 1837, referred to above, did not repeal the Act of 1822. Upon looking at the case of *Walker* v. *Gilbert*, it will be found that it merely decides that an affidavit of suretyship is necessary before the surety can have relief, only when the fact of suretyship does not otherwise appear of record; but when the fact of suretyship does appear of record, no affidavit is necessary to be made by the surety, either under the Act of 1837 or 1822, as was ruled directly in the case of *Moss* v. *Agricultural Bank*, 4 S. & M. 726.

No case can be found in which it has ever been ruled, in this State, that the provisions of the sixth section of the Act of 1837, did not apply to every class of suretyship; and no such decision could, in fact, be made without disregarding entirely the provisions of the Act of 1837, which expressly declares that, "in no case shall a levy be made upon the property of any surety or sureties, indorser or indorsers, unless an affidavit from some credible person be made and filed among the papers in the cause, setting forth that the principal has no property in this State, out of which the money and costs can be made." The two Acts of 1837 and 1822, may consistently stand together, and full effect can only be given to each of them by the construction here contended for.

2. The forthcoming bond under which plaintiff claims, was forfeited on the 16th of October, 1837. It was ruled by this court, in the case of *Moody* v. *Harper*, 25 Miss. R. 484, that a judgment is only a lien on such property as the defendant has at the date of its rendition, and is no lien upon after-acquired property. It is true that the plaintiff may sell property afterwards acquired, by virtue of an execution on his judgment; but the sale of such after-acquired property cannot be made unless the execution was levied upon it, or came into the hands of the sheriff before the defendant parted with the property. A purchaser of the defendant

of such after-acquired property would acquire a good title, not bound by the lien of the judgment unless an execution had been levied upon it, or was in the hands of the sheriff before his purchase. 25 Miss. R. 484.

Applying these rules to the facts of this case, it is manifest that John Shields had no interest in the property in controversy at the date of Harper's purchase under the execution, because he had sold it to Morris.   As before remarked, the forthcoming bond was forfeited on the 16th October, 1837.   At that time, the legal title was in the State, the purchase-money had not been paid to the State, and Shields had only an equitable interest in the property, which could not be sold by an execution at law.   He had, therefore, no interest in the property upon which the judgment operated as a lien at law.   *Presley* v. *Rogers*, 24 Miss. Rep. 520; *Boarman* v. *Catlett*, 13 S. & M. 151.

The bill alleges that in April, 1838, the whole purchase-money was paid to the State by Shields.   If this be true, it may be conceded that Shields acquired an interest at that time, which subjected the property to execution at law, although the naked legal title remained in the State.   It is, therefore, probable that a sale by virtue of the judgment under which plaintiff claims, would have vested title in the purchaser, if such sale had been made after the payment of the entire purchase-money to the State, and before John Shields sold to another party.   But in this case the property was not sold under the execution, nor was any execution levied upon it until many years after John Shields had sold it to Jacob and John Morris (whose title the defendants have), and after the legal title by patent from the State was vested in John Morris. Inasmuch, then, as Shields had no interest in the property subject to execution at law, at the date of the rendition of the judgment, his sale to John Morris vested a title in him, which the plaintiff's subsequent sale under execution could not divest.

3. Mason, the principal, died on the 27th day of September, 1837.   The bond in this case was forfeited on the 16th day of October, 1837, being subsequent to his death.   A forthcoming bond, when forfeited, has only the effect of a judgment.   A judgment rendered against a dead man is a nullity.   A statutory judgment on a forthcoming bond cannot *ex vi termini* have greater force or effect than if rendered by a court, as has been expressly

Harper *v.* Bibb & Hopkins.

ruled in this State.    *Smith* v. *Montgomery*, 11 S. & M. 284; 3 Yerger, 395.

The judgment was therefore void, as against Mason, the principal. Being void as to him, it was likewise void as to the other parties.

This court has ruled, when a bond is forfeited it becomes a joint judgment against all; if defective or erroneous as to one, it is so as to all.   A separate execution against one, omitting the others, cannot be sustained.   *Conn* v. *Pinder*, 1 S. & M. 386.

4. The proof in this case shows that John Shields, in 1838, sold the property in controversy to John and Jacob Morris.   It also shows that the purchase-money to the State was paid in part by Prickett, the surety of Shields, and that at the instance of Shields and Prickett, and by their direction, the patent was made by the State to John Morris.   That, after the patent was issued to John Morris, the property was levied on as the property of Jacob J. N. Morris; that it was sold as his property by the marshal, with the consent of John Morris, to John Martin; that John Morris afterwards died, leaving a widow and no children; that he was an illegitimate child, having no brothers or sisters; and that his widow was his sole heir-at-law, to whom all his title to the property descended.   John Martin purchased from the widow, receiving a deed from her.   This state of case shows the legal title to be in John Martin, who has conveyed to defendants, who now have the legal estate.

The plaintiff, by his purchase, only obtained an equitable title, even if it be admitted that Shields had an interest in the property which was subject to execution at law.

In cases like the present, the rule in a court of equity is, when the equities are equal, the law must prevail.   Equities are said to be equal when the parties are equally innocent and equally diligent. 1 Story Eq. sec. 57.

This rule is applied to cases, in which the purchase is originally of an equitable title without notice, and the purchaser afterwards, with notice, obtains or buys in a prior legal title, in order to support his equitable title.   1 Story Eq. sec. 57.   If these rules are applied to this case, the bill of complainant must be dismissed.

Since the foregoing brief was penned, the High Court have de-

cided that a judgment is no lien on the equitable interest of a debtor in property, and that a debtor may sell such equity after the rendition of the judgment, and the purchaser will be protected. *Marlow & Hoskins* v. *Johnson*, Opinion Book G. 171; see also 27 Miss. R. 251.

The court also decided, in the case of *Work* v. *Harper*, that an affidavit is necessary, under the Act of 1837, that the principal has no property, before the sheriff is authorized to levy on the property of the surety, and that it applies to sureties on forthcoming bonds.

*F. Anderson*, on same side,

Cited *Coleman* v. *Reeves*, 2 Cushm. 634; *Moss* v. *Agr. Bank*, 4 S. & M. 726; *Rogers* v. *Pressly*, 24 Miss. R. 525; 2 Am. Lead. Cases in Eq., Part 1, pp. 33, 34, 35.

FISHER, J., delivered the opinion of the court.

The object of this bill is to compel the defendants, who hold the legal title to certain lots in the city of Jackson, to convey the same to the complainant, and to compel the defendants to account for the rents and profits during the time they have been in possession.

The complainant purchased the lots at a sale made by the sheriff of Hinds county, in May, 1844, under an execution issued upon a forthcoming bond, in which C. C. Mayson was principal, and John Shields, and others, were securities, and forfeited on the 16th day of October, 1837. The lots appear to have been sold as the property of Shields. It further appears that Shields purchased the lots from the State, in June, 1834, and received a certificate or obligation, binding the State to execute to him a patent, on payment of the purchase-money; which appears to have been fully paid on the 16th day of April, 1838, at which time it is insisted the judgment under which the complainant claims, operated as a lien upon the lots; and that any sale made thereafter by Shields, was made subject to such lien.

The defendants, Bibb & Hopkins, claim under John Martin; who purchased the lots at a marshal's sale, made in 1839, under an execution against one John Morris, who purchased the lots in June, 1838, from Shields, and received, in December of that year, a patent for the lots from the State. The facts, in the clearest man-

ner, show that Bibb & Hopkins are purchasers for a valuable consideration, without notice of any equity of the complainant, or of the judgment creditor under whose execution the sale was made. It is, however, said that the judgment being a matter of record, the defendants were bound to take notice of the lien.

This position, admitting the existence of the lien, might be correct, if the defendants derived their title from or through Shields, the judgment debtor; but his name not appearing in connection with the title, they could not be required, by any rule exacting diligence in such case, to inquire into his affairs.

The patent which issued by the State to Morris, shows a purchase by him directly from the State, without in any manner referring to Shields; and, while it might be true that the defendants would be bound by liens existing against persons from whom, or through whom they had to trace their title, they could not, as innocent purchasers, be charged with a lien or latent equity existing against a person whose name was in no manner connected with the legal title which had vested in Morris, under the patent issued by the State. It may be safely admitted that the lien of the judgment under which the complainant claims, attached to the lots on the 16th of April, 1838; and yet not true that such lien existed, except to a limited extent, if at all, in 1842, when the defendants purchased from Martin; for a lien, like anything else, may be lost or destroyed. Shields, at the time the lien attached, had but an equitable title to the lots; and the same act which destroyed this equity, by vesting the legal title in another, and enabling that other to deal with third parties on the faith of the legal title, might also destroy the liens against the equitable title. When the equity ceased, that which incumbered it, as a general rule, would cease with it; and the question must, in such case, be, whether the incumbrance attached to the legal estate; for, after the patent was issued, there was no longer an equitable title; or, in other words, the State no longer occupied the attitude of a trustee, holding the legal title for Shields, or his assignee. This brings us to the question to be decided. The defendants, it is admitted, hold the legal title; and the rule is a familiar one, that a court of equity will not disturb a person holding such title, except for purpose of justice; and recognizing the force of this rule, it is only necessary to glance at the facts, to determine

what the decision must be. Morris, the party beneficially interested, stood by at the marshal's sale, and saw the lots purchased by Martin's agent, and a large amount of the debt against him thus cancelled. Nor does it appear that Morris, or his legal heirs, have ever since questioned the validity of this purchase. The defendants, Bibb & Hopkins, purchased from Martin at a time when the legal title was in Morris, if it had not passed to Martin, and paid a full price as the consideration of their purchase.

Morris, by holding the legal title, was enabled to deal with the property as his own; and when he did so deal with it, under the circumstances above named, the purchaser would be bound only by such equitable claims or rights of others, as were brought to his notice.

Thus viewing the main point in the case, we have not deemed it necessary to notice other points argued by counsel.

Decree affirmed.